## Case No. 4,295.
### EDWARDS v. The MANHASSET.[1]
[5 Hughes, 104.]
District Court, E. D. Virginia. Nov. 12, 1879.[2]

BY THE COURT. On the 3d day of June last the steamer George Leary was lying at Campbell's wharf with her bow projecting about twenty feet beyond the eastern corner of the wharf, to a line with the spiles of the west side of the slip used by the Norfolk and Berkely ferryboats. Just east of this slip and alongside of it lies the slip of the Norfolk and Portsmouth ferryboats. About twelve o'clock on that day a small sloop, the Elizabeth Kate, which had discharged a cargo of potatoes belonging to the libellant at the wharf, was pushed out by hand, with sail half up from inside the Leary, past her bow, for the purpose of going over past the two ferry slips to Bell's wharf, beyond. The wind was very light, and the sloop could and did make but very slow headway. It is the custom for the ferryboat for Berkely to leave her Norfolk slip just when the Portsmouth ferryboat leaves Portsmouth for Norfolk. On this occasion, the Elizabeth Kate pushed out past the Leary, just after the Berkely ferryboat left her Norfolk slip. She had on board her master. Colonna; and Edwards, the libellant, whose goods had just been discharged at Campbell's wharf. The Elizabeth Kate failed to clear the slip of the Norfolk and Portsmouth ferryboat in time to be out of the way of the Manhasset, which was the ferryboat then coming across from Portsmouth. Some ten yards out from the end of that slip, the Manhasset ran upon the sloop, carried her before her into the slip, to within six or eight feet of the float, inflicting damage upon her to the extent of $60. At the time of collision, Edwards, the libellant, was caught by the prow of the Manhasset against the sloop's mast, and his leg just above the ankle was quite severely bruised and injured. He was first taken to a station house and treated there by a physician, and was afterwards taken to St. Vincent's Asylum, where he was confined with great suffering for several weeks, until sufficiently recovered to return to his home in Hampton. His ankle joint

[1] [The opinion in this case is published from a copy certified by the clerk of the court from the records in his office.]

[2] [Affirmed by circuit court (case not reported).]

was painfully, and was at one time thought to be dangerously, affected; and is now the source of much pain, and is stiff, enlarged and the cause of more or less lameness.

The law of navigation applicable to this case is, that "when two vessels, one of which is a sail-vessel, are proceeding in such directions as to involve risk of collision, the steam-vessel shall keep out of the way of the sail-vessel." Another law is, that "every steam-vessel, when approaching another vessel, so as to involve risk of collision, shall slacken her speed, or if necessary, stop and reverse." These are not merely prudential rules which steamers may apply as well as they can in an emergency, but they are laws, statute laws of navigation, admitting of no modification or variation; they must be implicitly obeyed, and, as has been over and over again decided, effectively obeyed. It was not, therefore, the duty of the sloop to do anything whatever, on this occasion; on the contrary, it was her duty to keep on, and abstain from doing anything. There is no proof in the case that the sloop made any manoeuvre, or did any wanton or mistaken act tending to embarrass the steamer or to foil any manoeuvre the steamer might have made in compliance with the laws of navigation which have been quoted. And this case, therefore, turns upon what the steamer did, in obedience to the law requiring her "to keep out of the way of the sail-vessel." She did not keep out of the way of, but collided with, the sloop; and carried her after the collision some twenty yards or more into the slip. The only defense which she can urge in the case, (a defense however, which is not set out in the answer to the libel) is, that of "inevitable accident." But the weather was calm and clear; the hour was midday; the tide was in ebb; her machinery was in good working order; there was nothing the matter with her rudder or rudder-chain, or with her engine. There is no evidence of the existence of vis major in any shape. The case turns solely therefore upon the question, was there anything in the circumstances of the collision to excuse her for not having "kept out of the way of the sail-vessel?" This, the law imperatively commanded her to do; commanded her not merely to try to do, but to do effectively and successfully; for the rule is too important to the interests of commerce and navigation to admit of any other compliance with it, than effectual, successful compliance. "How not to do it" as to executing a law of navigation so important and so imperative as this, is an idea which cannot for a moment be tolerated when it concerns the movements of powerful steamers in a crowded harbor like that of Norfolk.

In considering this collision, I shall chiefly rely upon the evidence of the master of the Manhasset, Capt. Gregory. There was a great deal of evidence submitted at the trial, which was as violently conflicting as evidence in collision cases usually is. I shall take only his, as the best given for the defense. Capt. Gregory stated, that when he got to point 150 yards from the slip on the Norfolk side, he slowed down as he usually did at that point; that on doing so, he saw the sloop just come out from behind the bow of the Leary, making over towards Berkely; that he then gave the signal to back his wheels; and at once did everything he could to stop his boat, and prevent her from running down the sloop. Now, if he had gone as far as ten yards beyond where he first slowed down which was at a point 150 yards from the slip; and if, according to all the testimony he collided with the sloop at a point ten yards from the slip, then he ran 130 yards between the point at which he first saw the sloop to the point of collision.

And the defense in this case, taken in connection with this testimony, is, that a collision by the Manhasset is inevitable when, in the absence of any form of vis major, she sees a vessel ahead of her, after she slows down, at a distance of 130 yards. The consequences of accepting a defense based on this proposition, to the safety of shipping in this harbor would be so serious, that I dare not admit its validity. The usual speed of the Manhasset is at the rate of about eight miles an hour; and if it is true that her machinery has not the power to check her up, and stop her in a distance of 130 yards, or more than twice her length, then either she can not lawfully be employed in the harbor, or else her machinery should be changed. And if it is true, as the testimony of all those who were on board of her on the day of this collision establishes, that the crew knew she could not be stopped in that distance, then they were running the boat at an unlawful speed. For it is unlawful for any steamer to run in the harbor at such a speed, that on seeing a sail-vessel 130 yards forward in her path, she must needs run into her by "inevitable accident." The law of navigation must be obeyed and the speed given up. It is to be observed however that he contradicts his own theory by testifying positively that he really could check up his boat in the space of 75 yards. But even conceding that to be a fact (which I cannot believe is a fact) that the Manhasset cannot be stopped in the distance of 130 yards, and that her master knew that she could not, then her duty was to "keep out of the way," by going to one side or the other of the sloop; and the evidence shows that the course of the steamer was not in the least changed, nor any effort made to change it. If the Manhasset was so unmanageable that she could not be stopped in 130 yards, then her rudder ought to have been brought into active requisition and her course changed so as to "keep out of the way" of the sloop. I hold that the steamer was at fault and is responsible for the damages caused by the collision. Those sustained by the sloop are accurately ascertained, and a decree may be taken for $100 in favor of her owner.

Those sustained by the libellant, Edwards, depend upon estimation by the court. The bills of the hospital and physician in attendance, must be allowed, and amount to $90. Then, according to precedents, I am to fix the amount of damages due—1st. For pain and suffering. 2nd. For loss of time and earnings while actually disabled; and 3rd. for the loss likely to accrue as the permanent consequences of the injury, on the principles stated in my decision in Dunstan v. The R. R. Kirkland [Case No. 4,181]. I estimate the amount due for pain and suffering, which were very severe, at $500. I also, on like considerations to those then stated, estimate the actual loss in wages and earnings during the season during which Edwards was laid up, at $500. And I estimate the loss likely to be the consequence in the future of the diseased condition of his ankle at $500. I will give a decree for an aggregate of $1,590.